MORRIS v METRIYAKOOL

JACKSON v DETROIT MEMORIAL HOSPITAL

Docket Nos. 67480, 68208. Argued March 9, 1983 (Calendar Nos. 9, 10).—Decided March 1, 1984.

Delores M. Morris brought an action in the Macomb Circuit Court against S. Metriyakool, M.D., and South Macomb Hospital, alleging medical malpractice. The court, George R. Deneweth, J., granted the defendants' motion for dismissal on the ground that the plaintiff had agreed to submit claims or disputes arising out of her treatment to arbitration. The Court of Appeals, Cynar, J. (J. H. Gillis, J., concurring in the result; Bronson, P.J., concurring in part and dissenting in part), affirmed, holding the malpractice arbitration act to be constitutional (Docket No. 46598). The plaintiff appeals.

Diane Jackson brought an action for medical malpractice in the Wayne Circuit Court against the Detroit Memorial Hospital and William J. Bloom, D.D.S. The court, Irwin H. Burdick, J., granted the defendants' motion for accelerated judgment on the ground that the plaintiff had agreed to arbitrate such claims. The Court of Appeals, T. M. Burns, P.J., and Bronson and Pannucci, JJ., reversed, holding that the malpractice arbitration act prescribes the convening of an arbitration panel which is unconstitutionally biased, thereby denying a claimant due process (Docket No. 54337). The defendants appeal.

In opinions by Justice Kavanagh joined by Justice Levin, by Chief Justice Williams, and by Justice Ryan joined by Justice Brickley, the Supreme Court held:

The malpractice arbitration act does not deprive a claimant of the constitutional right to an impartial decisionmaker.

Justice Kavanagh wrote:

1. The malpractice arbitration act provides that a person

REFERENCES FOR POINTS IN HEADNOTES

[1-8] 61 Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 374-376.

Validity and construction of state statutory provisions relating to limitations on amount of recovery in medical malpractice claim and submission of such claim to pretrial panel. 80 ALR3d 583.

may agree to arbitrate claims or disputes arising from health care or treatment by a health-care provider. The agreement may not be made a prerequisite to health care; if executed, it may be revoked; and the patient must be so informed. The act additionally provides that where arbitration is elected the arbitration panel is to be composed of an attorney, a physician or a hospital administrator or a licensee of the health-care profession involved if the claim is not against a physician, and a person who is not a licensee of the health-care profession involved, an attorney, or a representative of a hospital or an insurance company.

2. The composition of the arbitration panel does not offend guarantees of due process. More than a general concern by physicians and hospital administrators with the cost and availability of malpractice insurance or the fact that physician and hospital administrator members of a panel are part of a class which is affected by a decision in a case involving other parties must be shown to render the probability of actual bias by the panel too high to be constitutionally tolerable. In these cases, no actual bias was shown, and there are no grounds sufficient to allow a conclusion that the panels would not act with honesty and integrity.

3. The form of an arbitration agreement is strictly controlled by the provisions of the act, and agreements conforming to the provisions are presumed valid. In these cases, the forms used were approved by the Commissioner of Insurance. Agreement to arbitrate is voluntary. Once the agreement is made, the burden of avoiding the agreement rests with the party seeking avoidance. The burden is not altered merely because the contract entails eschewal of constitutional rights. The sixty-day rescission period fully protects those who sign the agreement, allowing the patient to obtain desired treatment without being bound to its terms. It cannot be considered a contract of adhesion.

Chief Justice Williams, concurring, stated that the presence of a physician or a health-care provider on the arbitration panels in these cases was not shown by the plaintiffs to have resulted in such bias as to overcome the presumption of constitutionality of the malpractice arbitration act.

Justice Ryan, joined by Justice Brickley, wrote:

The malpractice arbitration act does not violate the Due Process Clause of the federal or state constitutions. The composition of a medical malpractice arbitration panel does not involve state action implicating the Due Process Clauses. Arbitration agreements prescribed by the act are not contracts of

adhesion, do not involve constructive fraud, and are enforceable.

1. The decision whether to agree to submit a dispute arising out of the provision of health care to arbitration is the patient's. If the patient decides to arbitrate, the dispute must be heard by a panel which includes an attorney, a doctor or representative of a health-care provider, and a person who is neither a doctor nor an attorney. The screening of candidates is done by both parties. The hearing, although informal, is procedurally much like civil litigation, and the decision of the panel may be appealed.

2. A person's due process rights are violated where there is deprivation by the state or a private person who may be fairly treated as the state (state action), of a constitutionally cognizable life, liberty, or property interest without due process of law. State action will be found where the state commands or encourages private action, where a private person performs traditionally exclusively governmental functions, or where the state and the private entities have a mutually dependent or symbiotic relationship. In these cases, the state has neither commanded nor encouraged arbitration; rather, it has created a system which provides for enforcement of a private decision to arbitrate where the agreement comports with the statutory form. The choice whether to arbitrate is private. The resolution of a private, civil dispute is not a traditionally exclusively governmental function; and a decision to arbitrate as allowed by the malpractice arbitration act does not create a symbiotic relationship between the state and the health-care provider.

3. The arbitration agreements in this case were not contracts of adhesion. They were not made between parties of unequal bargaining power; the plaintiffs were free to accept or reject the offers to arbitrate or to revoke the agreements later. The agreements, while standardized, were not written by, nor designed for, the exclusive benefit of the defendants. Rather, the essential provisions were determined by the Legislature to provide a fair alternative to malpractice litigation. The agreements were not a necessary prerequisite to health care; nor were they offered under any threat of negative consequences if refused.

4. The inclusion of a doctor or representative of a health-care provider in the composition of the arbitration panels in these cases and the failure of the defendants to disclose the attitudes of doctors in general, the biases of the medical profession in general against medical malpractice plaintiffs, or the effect of malpractice arbitration awards on malpractice insurance rates

was not constructive fraud. The composition was disclosed to the plaintiffs in literature which accompanied the arbitration agreement, and the defendants had no duty to disclose possible biases.

*Morris* is affirmed; *Jackson* is reversed.

Justice Cavanagh, dissenting, would hold that the statutory requirement that a medical malpractice arbitration panel include a health-care provider unconstitutionally deprives a person who enters into an agreement to arbitrate a dispute arising out of medical care of the right to a fair hearing before an impartial decisionmaker because of state action without due process of law. Parties to an arbitration agreement have no control over its terms. The state mandates the terms of the agreement and the procedures to be followed in arbitrating under the agreement, including appearance before and composition of the arbitration panel. Although the state may acquiesce in a person's choice of methods for dispute resolution, it cannot mandate procedures for resolving disputes which abridge constitutional rights. He would affirm the judgment of the Court of Appeals in *Jackson,* and would reverse and remand to the trial court in *Morris.*

107 Mich App 110; 309 NW2d 910 (1981) affirmed.

110 Mich App 202; 312 NW2d 212 (1981) reversed.

OPINION BY KAVANAGH, J.

1. PHYSICIANS AND SURGEONS — MALPRACTICE — ARBITRATION — DUE PROCESS.

*The provision of the malpractice arbitration act that an arbitration panel be composed of an attorney, a licensee of the health-care profession involved in a claim or a hospital administrator, and a person who is not a licensee of the health-care profession involved, an attorney, or a representative of a hospital or an insurance company, does not deprive a claimant of the constitutional right to an impartial decisionmaker (US Const, Am XIV; Const 1963, art 1, § 17; MCL 600.5044[2]; MSA 27A.5044[2]).*

2. PHYSICIANS AND SURGEONS — MALPRACTICE — ARBITRATION — FORM OF AGREEMENT — VALIDITY.

*The form of an agreement to arbitrate under the malpractice arbitration act is strictly controlled, and agreements conforming to the provisions of the act are presumed valid (MCL 500.3060, 600.5041, 600.5042; MSA 24.13060, 27A.5041, 27A.5042).*

3. PHYSICIANS AND SURGEONS — MALPRACTICE — ARBITRATION.

*An agreement to arbitrate is voluntary and cannot be made a prerequisite to health care; once the agreement is made, the burden of avoiding it rests with the party seeking avoidance, and the burden is not altered merely because the agreement entails eschewal of constitutional rights (MCL 600.5041, 600.5042; MSA 27A.5041, 27A.5042).*

OPINION BY RYAN, J.

4. PHYSICIANS AND SURGEONS — MALPRACTICE — ARBITRATION — DUE PROCESS.

*The malpractice arbitration act does not violate the Due Process Clause of the federal or state constitutions; the composition of a medical malpractice arbitration panel does not involve state action implicating the Due Process Clauses (US Const, Am XIV; Const 1963, art 1, § 17; MCL 600.5040 et seq.; MSA 27A.5040 et seq.).*

5. PHYSICIANS AND SURGEONS — MALPRACTICE — ARBITRATION — DUE PROCESS — STATE ACTION.

*The malpractice arbitration act neither commands nor encourages arbitration of disputes arising out of the provision of health care; rather, it provides a system for enforcement of a private decision to arbitrate where the arbitration agreement comports with the statutory form, and that does not amount to state action for due process purposes (US Const, Am XIV; Const 1963, art 1, § 17; MCL 600.5040 et seq.; MSA 27A.5040 et seq.).*

6. PHYSICIANS AND SURGEONS — MALPRACTICE — ARBITRATION — CONTRACTS OF ADHESION.

*Arbitration agreements which comported with the requirements of the malpractice arbitration act were not contracts of adhesion; the parties were not unequal in bargaining power, the agreements were not written by, nor designed for, the exclusive benefit of the health-care providers, and acceptance of the offer to arbitrate was not a prerequisite to health care (MCL 600.5040 et seq.; MSA 27A.5040 et seq.).*

7. PHYSICIANS AND SURGEONS — MALPRACTICE — ARBITRATION — CONSTRUCTIVE FRAUD.

*The inclusion of a doctor or a representative of a health-care provider in the composition of medical malpractice arbitration panels and the failure of the health-care providers to disclose the possible biases of medical professionals in general against medical malpractice plaintiffs or the effect of malpractice arbitration awards on malpractice insurance rates was not con-*

structive fraud where the composition of the panel was disclosed to the patients before they signed the agreements to arbitrate and where the health-care providers were not shown to have a duty to disclose possible biases (MCL 600.5040 et seq.; MSA 27A.5040 et seq.).

DISSENTING OPINION BY CAVANAGH, J.

8. PHYSICIANS AND SURGEONS — MALPRACTICE — ARBITRATION — DUE PROCESS.

The requirement that a medical malpractice arbitration panel include a health-care provider unconstitutionally deprives a person who enters into an agreement to arbitrate a dispute arising out of medical care of the right to a fair hearing before an impartial decisionmaker because of state action without due process of law (US Const, Am XIV; Const 1963, art 1, § 17; MCL 600.5040 et seq.; MSA 27A.5040 et seq.).

*Lopatin, Miller, Freedman, Bluestone, Erlich, Rosen & Bartnick* (by *Steven G. Silverman*) for plaintiffs Morris and Jackson.

*Kitch, Suhrheinrich, Smith, Saurbier & Drutchas, P.C.* (by *Donald A. Ducastel*), for defendant South Macomb Hospital, and (by *Stephen M. Kelley* and *Gregory G. Drutchas*), for defendants Detroit Memorial Hospital and Bloom.

*Schureman, Frakes, Glass & Wulfmeier* (by *Edward C. Reynolds, Jr.*), for defendant Metriyakool.

Amici Curiae:

*Nancy A. Baerwaldt*, Commissioner of Insurance, and *Nederlander, Dodge & McCauley, P.C.* (by *Victor T. Adamo* and *Patrick B. McCauley*), for Physicians Insurance Company of Michigan.

*Kerr, Russell & Weber* (by *A. Stewart Kerr* and *Daniel G. Beyer*) for Wayne County Medical Society and Michigan State Medical Society.

KAVANAGH, J. These cases concern arbitration of medical malpractice claims. The most significant issue presented is whether the malpractice arbitration act of 1975, MCL 600.5040 *et seq.;* MSA 27A.5040 *et seq.,* deprives plaintiffs of constitutional rights to an impartial decisionmaker. We hold that it does not.

Plaintiff Diane Jackson was treated in November, 1977, at defendant Detroit Memorial Hospital by defendant Dr. William J. Bloom for a dental malady. At that time, plaintiff agreed to submit to arbitration "any claims or disputes (except for disputes over charges for services rendered) which may arise in the future out of or in connection with the health care rendered to me * * * by this hospital, its employees and those of its independent staff doctors and consultants who have agreed to arbitrate". In August, 1979, plaintiff brought action for malpractice against defendants in the Wayne Circuit Court. Defendants moved for accelerated judgment, on the basis of the agreement to arbitrate. After a hearing, the court found the act constitutional and, finding no duress, mistake, or incompetency in the execution of the agreement, granted defendants' motion.

The Court of Appeals reversed, holding that MCL 600.5044(2); MSA 27A.5044(2) violates the constitutional guarantee of due process by " 'forcing the litigant to submit his or her claim to a tribunal which is composed in such a way that a high probability exists that such tribunal will be biased against the claimant without mandating the use of an arbitration form explicitly detailing the nature of the panel's makeup' ". *Jackson v Detroit Memorial Hospital,* 110 Mich App 202, 204; 312 NW2d 212 (1981), quoting *Morris v Metriyakool,* 107 Mich App 110, 134; 309 NW2d 910 (1981) (BRONSON, J., *dissenting in part and concur-*

*ring in part).* The Court also held that the arbitration agreement is not a contract of adhesion and that, on the present facts, it is not unconscionable. Defendants applied for leave to appeal, and plaintiffs sought leave to cross-appeal, which we granted. 412 Mich 885 (1981).

In the second case before us, plaintiff Delores M. Morris was admitted to defendant South Macomb Hospital on November 9, 1976. At the time of her admission, plaintiff executed an agreement similar to the one executed by plaintiff Jackson to arbitrate any claims against defendant hospital and defendant Dr. S. Metriyakool arising out of her treatment for a hysterectomy. Subsequently, plaintiff brought suit against defendants alleging negligence in the surgical procedure, which caused her to develop peritonitis, and negligence in failing to promptly diagnose and treat the condition. Defendants each moved to submit plaintiff's claims to arbitration in accordance with the agreement. The trial court dismissed plaintiff's complaint with prejudice, but without prejudice to her right to file a claim for arbitration.

The Court of Appeals rejected plaintiff's argument that the composition of the arbitration panel was unconstitutionally biased. It also held that the act does not unconstitutionally or unconscionably deprive a patient of a meaningful opportunity to decide whether to relinquish access to a court and a jury trial. The Court further held that the agreement was not a contract of adhesion. Judge BRONSON dissented from the holding of constitutionality. *Morris v Metriyakool, supra.* We granted plaintiff's application for leave to appeal. 412 Mich 884 (1981).

The malpractice arbitration act provides that a patient "may, if offered, execute an agreement to

arbitrate a dispute, controversy, or issue arising out of health care or treatment by a health care provider", MCL 600.5041(1); MSA 27A.5041(1), or by a hospital, MCL 600.5042(1); MSA 27A.5042(1). A patient executing such an agreement with a health-care provider may revoke it within 60 days after execution, MCL 600.5041(3); MSA 27A.5041(3), or, in the case of a hospital, within 60 days after discharge, MCL 600.5042(3); MSA 27A.5042(3), options which must be stated in the agreement. All such agreements must provide in 12-point boldface type immediately above the space for the parties' signatures that agreement to arbitrate is not a prerequisite to the receipt of health care. MCL 600.5041(5), 600.5042(4); MSA 27A.5041(5), 27A.5042(4).

For those who have elected arbitration, the act requires a three-member panel composed of an attorney, who shall be chairperson, a physician, preferably from the respondent's medical specialty, and a person who is not a licensee of the health-care profession involved, a lawyer, or a representative of a hospital or an insurance company. MCL 600.5044(2); MSA 27A.5044(2). Where the claim is against a hospital only, a hospital administrator may be substituted for the physician. If the claim is against a health-care provider other than a physician, a licensee of the health-care profession involved shall be substituted.

Defendants Detroit Memorial Hospital and Dr. Bloom appeal from the holding that the presence of the medical member unconstitutionally created a biased panel. First, they argue that because the state does not compel arbitration, but only regulates it, state action is not involved.

A basic requirement of due process is a "fair trial in a fair tribunal". *In re Murchison,* 349 US

133, 136; 75 S Ct 623; 99 L Ed 942 (1955); *Withrow v Larkin,* 421 US 35, 46; 95 S Ct 1456; 43 L Ed 2d 712 (1975). Essential to this notion is a fair and impartial decisionmaker. *Crampton v Dep't of State,* 395 Mich 347, 351; 235 NW2d 352 (1975). The Due Process Clause, US Const, Am XIV; Const 1963, art 1, § 17, limits state action. *Dow v State of Michigan,* 396 Mich 192, 202; 240 NW2d 450 (1976). Private conduct abridging individual rights does not implicate the Due Process Clause unless to some significant extent the state, in any of its manifestations, has been found to have become involved in it, see *Burton v Wilmington Parking Authority,* 365 US 715; 81 S Ct 856; 6 L Ed 2d 45 (1961), or to have compelled the conduct, *Flagg Bros, Inc v Brooks,* 436 US 149, 164; 98 S Ct 1729; 56 L Ed 2d 185 (1978). See also *Jackson v Metropolitan Edison Co,* 419 US 345; 95 S Ct 449; 42 L Ed 2d 477 (1974).

We find it unnecessary, however, to determine here whether the state has significantly involved itself in the challenged action because, even if we were to find so, we have concluded that the composition of the arbitration panel does not offend guarantees of due process.

In holding the act unconstitutional, the Court of Appeals in *Jackson* agreed with Judge BRONSON's partial dissent in *Morris* that the arbitration panel presents too high a probability of actual bias to be constitutionally tolerable. In his partial dissent in *Morris,* Judge BRONSON found the statute creating the panel unconstitutional because the medical member of the arbitration panel had such an interest in the outcome that there is too great a risk that he will not be impartial. Judge BRONSON cited two affidavits submitted in *Morris* from malpractice insurance underwriters. They averred

that any hospital administrator or physician would have a direct and substantial interest in the outcome of arbitrated cases because the cost and availability of medical malpractice insurance would be affected. Judge BRONSON also said that the act in question is supported by health-care professionals, which indicates that they believe they will fare better under this type of system. He also concluded that anti-plaintiff attitudes exist among large numbers of doctors. "Their 'function and frame of reference' may be expected to make them partisans of their professional colleagues." *Morris,* 107 Mich App 129 (BRONSON, J., *dissenting in part and concurring in part).*

No showing of actual bias on the part of a particular arbitration panel is claimed, the parties having appealed from motions for accelerated judgment and no arbitration panel having been convened. That does not prevent a party from claiming that the risk of actual bias is too high to be constitutionally tolerable. "[O]ur system of law has always endeavored to prevent even the probability of unfairness." *Murchison, supra,* 349 US 136. "In pursuit of this end, various situations have been identified in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow, supra,* 421 US 47. Included in those situations is that of a decisionmaker who has a direct or substantial pecuniary interest in the outcome of the controversy. *E.g., Gibson v Berryhill,* 411 US 564; 93 S Ct 1689; 36 L Ed 2d 488 (1973); see *Crampton, supra,* 395 Mich 351-355.

Such a pecuniary interest is claimed here—the decisionmaker's interest in lower malpractice insurance premiums will influence his decision to-

wards reducing the number and size of malpractice awards. In their affidavits, the underwriters averred that physicians and hospital administrators have a vested interest in the medical malpractice claims made against others; the claims made do affect the rate of insurance premiums and the availability of insurance. Premium rates for all doctors, they averred, are generally determined by the number of all claims, settlements, and judgments against physicians and hospitals in Michigan. The effect of an arbitration award on insurance rates is thus said to be direct and substantial.

This situation is aggravated, contends plaintiff Jackson, by the composition of the advisory committee, which selects the pool of candidates from which all members of the arbitration panel are chosen. The statute provides:

"An arbitration advisory committee is created within the bureau of insurance and shall be appointed by the commission and shall consist of 18 members. One-half of the advisory committee shall be broadly composed of licensed physicians and other health care providers, licensed hospital or institutional health care providers, malpractice insurance carriers and licensed legal practitioners. One-half shall be broadly composed of nongovernmental, nonlawyer, nonhealth care provider, and noninsurance carrier persons. The committee may appoint 1 or more specialized subcommittees with the approval of the commissioner." MCL 500.3054; MSA 24.13054.

The medical part of the committee, which includes the malpractice insurance carriers and health-care providers, has a direct interest in reducing the number and size of malpractice awards. There is a substantial possibility, plaintiff Jackson insists, that they will select candidates who are similarly inclined.

All that has been shown here with any degree of certainty is that there is a relationship between the number and size of malpractice awards on the one hand, and the cost and availability of malpractice insurance on the other. This may be taken for granted. It may also be assumed that, because physicians and hospital administrators are concerned with the cost and availability of malpractice insurance, they are members of a class which is affected by the decision in a case between other parties. See *Tumey v Ohio,* 273 US 510, 522; 47 S Ct 437; 71 L Ed 749; 50 ALR 1243 (1927). More than that must be shown, however, to make out a case which offends due process.

In *Tumey,* the village mayor was disqualified from sitting as a judge where he was compensated from fines imposed for violation of the state prohibition act. The Court concluded that the mayor "had a direct, personal, pecuniary interest in convicting the defendant who came before him for trial, in the twelve dollars of costs imposed in his behalf, which he would not have received if the defendant had been acquitted." *Tumey,* p 523.

In *Ward v Monroeville,* 409 US 57; 93 S Ct 80; 34 L Ed 2d 267 (1972), although the mayor was not directly compensated from fines imposed for traffic offenses, he held wide executive powers and was responsible for village finances. The Court disqualified the mayor from sitting as a judge because the mayor's executive responsibilities for village finances might have made him partisan to maintain the high level of contribution from the mayor's court. Revenue from fines, costs, and fees collected in the mayor's court annually contributed almost half of the total village revenues.

Also, in *Gibson, supra,* the Court affirmed the district court's finding that the Alabama Board of

Optometry was biased and could not provide a fair and impartial hearing to optometrists charged with unprofessional conduct for working for a corporation. The board was composed solely of independent doctors not employed by corporations. The Court held that the board had a substantial pecuniary interest in the proceedings because what was sought was the revocation of the licenses of nearly half of all optometrists in the state which, if successful, would possibly redound to the personal benefit of members of the board.

In the present case, by contrast, it has not been demonstrated that the medical members of these panels have a direct pecuniary interest or that their decision may have any substantial effect on the availability of insurance or insurance premiums. We have been shown no grounds sufficient for us to conclude that these decisionmakers will not act with honesty and integrity. We look for a pecuniary interest which creates a probability of unfairness, a risk of actual bias which is too high to be constitutionally tolerable. It has not been shown here.

Plaintiff Jackson also argues that as a class physicians and hospital administrators possess a subliminal bias against patients who claim medical malpractice.

We interpret this as a claim made out under *Crampton, supra.* In *Crampton,* we held that the probability of actual bias was too high where a prosecutor and a police officer sat on an appeal board to review the revocation of Crampton's driver's license for refusal to submit to a chemical test upon arrest for driving under the influence of intoxicating liquor. Police officers and prosecutors are full-time law enforcement officials, we said, deeply and personally involved in the fight against

law violators. "[T]hey are identified and aligned with the state as the adversary of the citizen who is charged with violation of the law. Their function and frame of reference may be expected to make them 'partisan to maintain' their own authority and that of their fellow officers." *Crampton, supra,* 395 Mich 357.

We do not believe that the medical members of these panels are so identified and aligned with respondents in malpractice cases that they may be expected to favor the respondents. Physicians and other health care professionals are trained in the medical arts and are oath-bound to treat the ill. Hospital administrators are trained in the proper functioning of hospitals. Neither physicians nor hospital administrators have professional interests that are adverse to patients or even malpractice claimants on a consistent, daily basis. Any identity of interest with respondents is not so strong as to create a subliminal bias for one side and against the other.

"All questions of judicial qualification may not involve constitutional validity. Thus matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion." *Tumey, supra,* 273 US 523. We are not persuaded that these arbitration panels deprive plaintiffs of fair and impartial decisionmaking.

Plaintiffs next argue that the arbitration agreement waives constitutional rights to a jury trial and access to a court. Because these fundamental rights are waived, they say, the burden should rest with the defendants to show a valid contract, which they can only do by showing that the waiver was made voluntarily, knowingly, and intelligently. The burden of showing a voluntary

waiver is not an easy one, argue plaintiffs, because the arbitration agreement was offered at the time of admission to the hospital in an atmosphere infected with implicit coercion. Additionally, plaintiffs argue that a knowing and intelligent waiver will not be easily shown because the defendants are chargeable with constructive fraud. Constructive fraud is said to arise out of the agreement's failure to highlight the fact of waiver, failure to disclose the composition of the arbitration panel (even though this information is contained in an informational booklet accompanying the agreement), and failure to disclose the attitudes of physicians in general, that they and hospital administrators may be biased and the reasonable probability that insurance rates are affected by awards.

The defendants respond that we should not consider any of these arguments because they were not raised in the lower courts. The only issues properly preserved for appeal, defendants argue, besides the due process question about the panel's composition, are whether the arbitration agreement is a contract of adhesion and whether it is unenforceable as unconscionable.

Some of the issues briefed by plaintiffs are raised for the first time in this appeal. Ordinarily we would not consider these questions, but, because the same or similar issues are pending in other cases in the lower courts, we address plaintiffs' contentions. *Johnston v Michigan Consolidated Gas Co,* 337 Mich 572, 580; 60 NW2d 464 (1953).

Answering the merits of plaintiffs' questions, defendants contend that arbitration is a matter of contract and that one who signs a written agreement is presumed to understand it. The act pre-

sumes a conforming agreement to be valid, MCL 600.5041(7), 600.5042(8); MSA 27A.5041(7), 27A.5042(8). Therefore, the burden of disproving this arbitration agreement rests with plaintiffs. Moreover, say defendants, the burden of establishing a constitutional violation rests with the party asserting it. The arbitration agreement and informational booklet reasonably indicated that arbitration was an exclusive alternative to trial by jury. Plaintiffs expressly waived their rights to trial by jury. Arbitration is voluntary and not required, which the agreement plainly states in capital letters above the signature. The form of the agreement and the information booklet is strictly controlled, MCL 500.3053, 500.3060, 600.5041, 600.5042; MSA 24.13053, 24.13060, 27A.5041, 27A.5042, and was approved by the Michigan Commissioner of Insurance.

Plaintiffs, contend defendants, have failed to demonstrate that they were coerced into signing the agreement. Answering the argument of constructive fraud, defendants say that the information booklet given to plaintiffs states that a doctor or hospital administrator serves on the arbitration panel. A chart in the booklet also states that a court case is heard by a judge and jury while an arbitration case is heard by the three-member panel.

We reject plaintiffs' allocation of the burden of proof to defendants. The burden of avoiding these arbitration agreements, as with other contracts, rests with those who would avoid them. The act states that an agreement to arbitrate which includes the statutory provisions shall be presumed valid. MCL 600.5041(7), 600.5042(8); MSA 27A.5041(7), 27A.5042(8).

The burden of showing some ground for rescind-

ing or invalidating a contract is not altered merely because the contract entails eschewal of constitutional rights. Plaintiffs' allegations of coercion, like other contract defenses of mistake, duress, and fraud, must be proven by the party seeking to avoid the contract on such grounds.

Plaintiff Jackson contends that the arbitration agreement is a contract of adhesion, the terms of which exceeded her reasonable expectations. She claims that by not stating explicitly that court access with the right to jury trial was waived, this fact was in effect concealed and hence the contract is unconscionable.

Contracts of adhesion are characterized by standardized forms prepared by one party which are offered for rejection or acceptance without opportunity for bargaining and under the circumstances that the second party cannot obtain the desired product or service except by acquiescing in the form agreement. *Steven v Fidelity & Casualty Co of New York,* 58 Cal 2d 862, 879; 27 Cal Rptr 172; 377 P2d 284 (1962), see *Allen v Michigan Bell Telephone Co,* 18 Mich App 632; 171 NW2d 689 (1969), *lv den* 383 Mich 804 (1970), *Zurich Ins Co v Rombough,* 384 Mich 228, 232-233; 180 NW2d 775 (1970), and *cf. Cree Coaches, Inc v Panel Suppliers, Inc,* 384 Mich 646, 649; 186 NW2d 335 (1971). Regardless of any possible perception among patients that the provision of optimal medical care is conditioned on their signing the arbitration agreement, we believe that the sixty-day rescission period, of which patients must be informed, fully protects those who sign the agreement. The patients' ability to rescind the agreement after leaving the hospital allows them to obtain the desired service without binding them to its terms. As a result, the agreement cannot be considered a contract of adhesion.

We also reject plaintiff's claim that the arbitration agreement is unconscionable. According to the record before us, the arbitration agreement signed by plaintiff Jackson is six paragraphs long. The first sentence of the first paragraph begins, "I understand that this hospital and I by signing this document agree to arbitrate any claims or disputes". The first two sentences of the second paragraph state:

"I understand that Michigan Law gives me the choice of trial by judge or jury or of arbitration. I understand that arbitration is a procedure by which a panel that is either mutually agreed upon or appointed decides the dispute rather than a judge or jury."

This was not a long contract covering different terms, only one of which, obscured among many paragraphs, concerned arbitration. Arbitration was the essential and singular nature of the agreement. We do not believe that an ordinary person signing this agreement to arbitrate would reasonably expect a jury trial. We also reject plaintiffs' argument that the agreement is unconscionable for failure to highlight these terms. See *Williams v Walker-Thomas Furniture Co,* 121 US App DC 315, 319; 350 F2d 445; 18 ALR3d 1297 (1965).

Finally, both plaintiffs ask that we find constructive fraud and hold that the agreements are unconscionable because of failure of the contracts to disclose the composition of the panel, the attitudes of physicians, the fact that the medical member of the panel may be intrinsically biased against plaintiffs, and the reasonable probability that malpractice rates are affected by awards in medical malpractice cases.

We decline. We do not believe that the agreements are unconscionable for failing to include

plaintiffs' recommendations. Nor do we believe that defendants have breached a legal or equitable duty which has had the effect of deceiving plaintiffs, nor have defendants received an unmerited benefit. *Goodrich v Waller,* 314 Mich 456, 462; 22 NW2d 862 (1946).

In *Jackson,* we reverse the finding of unconstitutionality and reinstate the order of the trial court submitting the matter to arbitration.

In *Morris,* we affirm.

No costs, a public question.

LEVIN, J., concurred with KAVANAGH, J.

WILLIAMS, C.J. *(concurring for constitutionality).* The provision of medical services is one of the most important and, in many aspects, one of the most difficult concerns of our day. One particularly difficult problem connected with the provision of medical services is medical malpractice dispute resolution. Medical malpractice litigation, as many will remember, reached crisis proportions. The consequences of the failure to adequately address this situation seemed incalculable.

The Legislature in the Medical Malpractice Arbitration Act of 1975, MCL 600.5040 *et seq.;* MSA 27A.5040 *et seq.,* in its wisdom, attempted to address this serious problem. This litigation raises the question whether that act deprives litigants of a fair procedure in a fair tribunal because of the presence of a physician or health-care provider on the arbitration panel.

While I believe my brother M. F. CAVANAGH makes a strongly reasoned case that the Medical Malpractice Arbitration Act of 1975 unconstitutionally deprives plaintiffs of their due process rights to a fair and impartial decisionmaker, I am

not wholly persuaded that plaintiffs' proofs of bias are strong enough to overcome the presumption of constitutionality of legislative action. I therefore concur with my brother T. G. KAVANAGH's conclusion that in these cases the arbitration panels have not been shown to be constitutionally biased by the presence of medical representatives.

RYAN, J. We are asked to determine whether the Medical Malpractice Arbitration Act (MMAA) of 1975, MCL 600.5040 *et seq.;* MSA 27A.5040 *et seq.,* violates the Due Process Clause of the federal constitution, US Const, Am XIV, § 1, or of the Michigan state constitution, Const 1963, art 1, § 17, by requiring that a doctor or representative of a health-care provider serve as a member of the three-person arbitration panel. The plaintiffs claim that the MMAA violates their due process rights by denying them an impartial decisionmaker since the statute mandates that a medical person participate as a panel member. In *Jackson v Detroit Memorial Hospital,* 110 Mich App 202, 204; 312 NW2d 212 (1981), the Court of Appeals agreed that the MMAA did violate plaintiff Jackson's due process rights by

"forcing the litigant to submit his or her claim to a tribunal which is composed in such a way that a high probability exists that such tribunal will be biased against the claimant without mandating the use of an arbitration form explicitly detailing the nature of the panel's makeup."

However, in *Morris v Metriyakool,* 107 Mich App 110; 309 NW2d 910 (1981), the Court held that the MMAA did not violate the Due Process Clause of the federal or state constitution.

We hold that the MMAA does not violate the

Due Process Clause of either the federal or the state constitutions since the composition of the arbitration panel does *not* involve "state action" implicating the Due Process Clauses.

The plaintiffs also allege that even if the MMAA is constitutional, the arbitration agreements in these cases must not be enforced since they are contracts of adhesion and involve constructive fraud. We hold that the arbitration agreements are not contracts of adhesion, involve no fraud, and are enforceable.

### *Jackson v Detroit Memorial Hospital and Bloom*

On November 3, 1977, plaintiff Jackson entered Detroit Memorial Hospital for non-emergency dental treatment by Dr. Bloom. At the time of her admission, the plaintiff executed an arbitration agreement which provided that, should she have any dispute with the hospital or the doctor concerning her care or treatment, the dispute would be submitted to arbitration. In accordance with the Medical Malpractice Arbitration Act, the plaintiff received a copy of the agreement which stated, in bold print above the signature line, that:

"This Agreement to Arbitrate Is not a Prerequisite to Health Care or Treatment, and May Be Revoked Within 60 Days After Execution by Notification in Writing to: Medical Records Director * * *"

Along with a copy of the agreement, the hospital gave the plaintiff a booklet promulgated by the Michigan Commissioner of Insurance which more fully explained the arbitration system. Specifically, the booklet stated that a doctor or health-care provider would sit as a member of the arbitration

panel. The plaintiff has never revoked the arbitration agreement.

On August 22, 1979, the plaintiff filed a complaint in the Third Judicial Circuit Court alleging that the hospital and the doctor were guilty of malpractice in the manner in which the plaintiff was treated. On October 9, 1979, the defendants moved for accelerated judgment, asserting that the court had no jurisdiction over the case. The trial court granted the defendants' motion for accelerated judgment, holding that the court lacked jurisdiction because of the arbitration agreement.

The plaintiff appealed the grant of accelerated judgment to the Court of Appeals and raised three issues:

1) That the MMAA violated the plaintiff's right to a hearing before a fair and impartial decisionmaker.

2) That the MMAA, as applied, was unconscionable.

3) That the arbitration agreements conforming with the MMAA were contracts of adhesion.

The Court of Appeals held that the MMAA was unconstitutional as a violation of the plaintiff's due process right to a fair and impartial decisionmaker because one member of the arbitration panel was required to be a doctor or health-care provider's representative, but that the statute was not unconscionable and did not constitute a contract of adhesion. *Jackson v Detroit Memorial Hospital*, 110 Mich App 202; 312 NW2d 212 (1981).

*Morris v Metriyakool and South Macomb Hospital*

Plaintiff Morris entered South Macomb Hospital on November 9, 1976, for non-emergency surgery under the care of defendant Dr. Metriyakool. In

the course of her admission to the hospital, the plaintiff executed an arbitration agreement which provided that, should she have any dispute with the hospital or the doctor concerning her care or treatment, the dispute would be submitted to arbitration. In accordance with the MMAA, the arbitration agreement the plaintiff signed stated, in bold print above the signature line, that:

"THIS AGREEMENT TO ARBITRATE IS NOT A PREREQUISITE TO HEALTH CARE OR TREATMENT, AND MAY BE REVOKED WITHIN 60 DAYS AFTER EXECUTION BY NOTIFICATION IN WRITING TO: MEDICAL RECORDS DIRECTOR * * *."

The plaintiff does not allege that she did not receive a copy of the agreement or that it was not accompanied by the booklet promulgated by the Commissioner of Insurance which fully explained the arbitration system, including the fact that a doctor or health-care provider would sit on the arbitration panel. The plaintiff did not revoke the arbitration agreement.

On July 19, 1977, the plaintiff filed a complaint in the Macomb Circuit Court, alleging that the hospital and the doctor were guilty of malpractice in the care and treatment she received during or following the plaintiff's surgery at South Macomb Hospital. On October 25, 1977, the defendant hospital moved to submit the matter to arbitration. On July 19, 1979, the trial court dismissed the plaintiff's case with prejudice. The plaintiff appealed to the Court of Appeals. The Court of Appeals held that the MMAA did not violate the Due Process Clause, that the MMAA was not unconscionable, and that the MMAA did not involve contracts of adhesion. *Morris v Metriyakool,* 107 Mich App 110; 309 NW2d 910 (1981).

I. THE CHALLENGED ACT: MEDICAL MALPRACTICE
ARBITRATION ACT OF 1975

It may be helpful to examine the relevant provisions of the MMAA in some detail. The statute provides that a "health care provider" may, and a "hospital" must, offer to arbitrate disputes arising from the provision of health care. The offer, to be enforceable under the MMAA, must be made in compliance with the following statutory conditions:

1) the offer to arbitrate must be in writing;

2) the offer, if accepted by the patient, must be revocable for 60 days if revoked in writing;

3) the agreement must state, above the signature line in 12-point boldface type, that "THIS AGREEMENT TO ARBITRATE IS NOT A PREREQUISITE TO HEALTH CARE OR TREATMENT AND MAY BE REVOKED WITHIN 60 DAYS AFTER EXECUTION BY NOTIFICATION IN WRITING TO: * * *";

4) the patient must be given a booklet detailing the specific provisions of the arbitration agreement;

5) the patient must be given a copy of the arbitration agreement; and

6) the offer to arbitrate must not precede the provision of emergency medical care. MCL 600.5041; MSA 27A.5041, MCL 600.5042; MSA 27A.5042.

However, the MMAA does not require that the patient accept the doctor's or the hospital's offer to arbitrate. The decision whether or not to arbitrate is left entirely to the patient.

The statute delineates the structure in which medical malpractice arbitration will occur in cases in which the patient accepts the offer to arbitrate disputes arising from the care or treatment. The statute provides that the dispute will be heard by

a three-person panel composed of an attorney, a
doctor or hospital administrator, and a person who
is neither a doctor nor an attorney. MCL 600.5044;
MSA 27A.5044. Candidates for arbitrator positions
are required to be screened by the American Arbi-
tration Association or "other entity organized to
arbitrate disputes pursuant to this chapter". The
screening includes consideration of a biographical
statement by the proposed arbitration panel mem-
ber and completion of a disclosure statement
signed under oath. The candidate may also be
personally interviewed by representatives of the
association. MCL 600.5044; MSA 27A.5044, MCL
600.5045; MSA 27A.5045. From a roster of ac-
cepted candidates, the association compiles a list of
five candidates in each of the three categories of
panel members and sends the lists to the parties
who agreed to arbitrate. MCL 600.5044; MSA
27A.5044. The parties are also given the candi-
dates' biographical sketches and may submit ques-
tions to the prospective panelists through the asso-
ciation. The parties then pick the arbitrators by
striking from the lists the name of any candidate
who is not satisfactory. No showing of cause is
required. The first candidate in .each list who is
mutually agreeable to the parties is placed on the
panel. If none can be agreed upon from the first
set of lists, a second set of lists is provided and the
process is repeated. If the parties still cannot agree
upon a candidate for each category, the association
proposes a single candidate to fill each remaining
vacancy. This candidate can be challenged only for
cause which requires that facts be produced to
"establish that unusual community or professional
pressures will unreasonably influence the objectiv-
ity of the panelist". Additionally, if the parties
elect, they may agree upon a person to sit on the
arbitration panel who is. not a candidate suggested

by the association. The panel must still, in any event, be composed of a lawyer, a doctor or hospital administrator, and a person who is neither. MCL 600.5044; MSA 27A.5044.

Once the arbitration panel is chosen, the arbitration hearing is procedurally much like civil litigation. The parties may be represented by counsel, may present material evidence, may testify, and may cross-examine witnesses. The concepts of duty and care and practice are identical to those used in civil litigation. There are no limits on the award of damages except as provided by law. MCL 600.5043; MSA 27A.5043. Expert testimony is admissible, but is not required. The hearing is informal and in accordance with the rules promulgated by the association except that the federal rules of civil procedure must be followed where not following them would result in substantial prejudice. MCL 600.5050; MSA 27A.5050. Pretrial discovery and subpoenas are available essentially as allowed in civil litigation. MCL 600.5048; MSA 27A.5048, MCL 600.5051; MSA 27A.5051.

A majority of the panel may grant any relief deemed equitable and just. In reaching its decision, the panel may order written briefs, but must decide within 30 days of the termination of the hearing or of the submission of written briefs. The decision must be in writing, must be signed, and must include the panel's determination of all issues submitted for arbitration which are necessary to the resolution of the dispute. The panel's written opinion must include the reasons for a finding of liability or nonliability, the reasons for the award, and, where applicable, a determination of the degree of fault of each of the parties. A dissenting panel member may file a written dissent. MCL 600.5055; MSA 27A.5055. The decision of the

arbitration panel is appealable according to the procedures and the grounds available under the arbitration law and applicable court rules.

The MMAA also includes numerous provisions concerning the arbitration process which are not directly applicable to this case.

## II. STATE ACTION

The plaintiffs' primary contention is that the challenged act violates their due process rights. The United States Supreme Court has repeatedly indicated that a three-step analysis is required to determine whether there has been a due process violation.[1] For a due process violation to exist, as

---

[1] The United States Supreme Court has traditionally spoken of a two-step due process violation test. In *Ingraham v Wright,* 430 US 651, 672; 97 S Ct 1401; 51 L Ed 2d 711 (1977), the Court stated the test as follows:

"The Fourteenth Amendment prohibits any state deprivation of life, liberty, or property without due process of law. Application of this prohibition requires the familiar two-stage analysis: We must first ask whether the asserted individual interests are encompassed within the Fourteenth Amendment's protection of 'life, liberty or property'; if protected interests are implicated, we then must decide what procedures constitute 'due process of law'."

The Court apparently spoke in terms of a two-stage analysis because there was no dispute in the case concerning the existence of "state action".

However, in *Martinez v California,* 444 US 277, 284-285; 100 S Ct 553; 62 L Ed 2d 481 (1980), the Court applied a three-stage analysis to due process challenges.

"[T]he Fourteenth Amendment protected her only from deprivation by the 'State * * * of life * * * without due process of law'. Although the decision to release Thomas from prison was action by the State, the action of Thomas five months later cannot be fairly characterized as state action. * * * [W]e hold that, taking these particular allegations as true, [the State] did not 'deprive' appellants' decedent of life within the meaning of the Fourteenth Amendment".

The *Martinez* due process analysis is, therefore, divided into three steps: 1) was there state action, 2) which deprived the person of life, liberty, or property, 3) without due process of law.

In *Parratt v Taylor,* 451 US 527, 536-537; 101 S Ct 1908; 68 L Ed 2d 420 (1981), the Court articulated the due process test in terms of four steps:

the plaintiffs assert, there must be:

1) a deprivation by the state or a private person who may be fairly treated as the state;

2) of a constitutionally cognizable life, liberty, or property interest;

3) without due process of law.[2]

If any one of these elements is missing, the challenged conduct is not a violation of due process no

---

"Unquestionably, respondent's claim satisfies three prerequisites of a valid due process claim: The petitioners acted under color of state law; the hobby kit falls within the definition of property; and the alleged loss, even though negligently caused, amounted to a deprivation. Standing alone, however, these three elements do not establish a violation of the Fourteenth Amendment. Nothing in that Amendment protects against all deprivations of life, liberty, or property by the State. The Fourteenth Amendment protects only against deprivations 'without due process of law'."

We note that the "tests" have the following common elements, regardless of the particular articulation of the analysis: 1) an act by the state, 2) which deprives the person of life, liberty, or property, 3) without due process of law. Since this three-step analysis is most direct and logical, we have stated the analysis in three steps.

[2] We recognize that Justice KAVANAGH and Chief Justice WILLIAMS have chosen to decide the case upon the basis of the third element of the test: "without due process of law". We believe that such an analysis is inappropriate.

There can be no due process concern without state action. "[T]he commands of the Fourteenth Amendment are addressed only to the State or to those acting under color of its authority". *District of Columbia v Carter,* 409 US 418, 423; 93 S Ct 602; 34 L Ed 2d 613 (1973). Until there is a finding, implicit or explicit, of state action, the due process requirements of the Fourteenth Amendment are not implicated and should not be addressed. Even the language of § 1 of the Fourteenth Amendment leads to this organization of the evaluation of a due process challenge:

"[N]or shall any State deprive any person of life, liberty, or property, without due process of law".

Following the lead of the United States Supreme Court which has not, so far as our research shows, ever passed over the state action issue to reach a later step of the test, we shall not assume state action and decide this case on "without due process of law" grounds.

matter how "discriminatory or wrongful". *Blum v Yaretsky,* 457 US 991, 1002; 102 S Ct 2777; 73 L Ed 2d 534 (1982), citing *Shelly v Kraemer,* 334 US 1, 13; 68 S Ct 836; 92 L Ed 1161 (1948).

We begin then with the "state action" element of the Due Process Clause analysis.

### Background United States Supreme Court Case Law

The United States Supreme Court has recognized that the task of determining whether state action exists is not as simple as might appear since few cases raise the issue in instances in which a state acts directly or a private person acts without *any* involvement of the state. Rather, the issue is usually raised on middle ground facts where the challenged action is neither purely state action nor purely private action. As the United States Supreme Court stated in *Jackson v Metropolitan Edison Co,* 419 US 345, 349-350; 95 S Ct 449; 42 L Ed 2d 477 (1974):

"While the principle that private action is immune from the restrictions of the Fourteenth Amendment is well established and easily stated, the question whether particular conduct is 'private', on the one hand, or 'state action', on the other, frequently admits of no easy answer."

Although no easy answer is always evident, the United States Supreme Court has identified three situations in which "private action" rises to the level of "state action" so as to involve the due process requirements of the Fourteenth Amendment:

First, the "state action"/ "private action" nexus

is formed when the challenged conduct "has sufficiently received the imprimatur of the State so as to make it 'state' action for purposes of the Fourteenth Amendment". *Blum, supra,* p 1003.

Second, the "state action"/"private action" nexus is formed where the challenged "private" conduct involves the exercise of powers that are "traditionally the exclusive prerogative of the State". *Jackson v Metropolitan Edison,* p 353.

Third, the "state action"/"private action" nexus is formed where the challenged conduct necessitates a "symbiotic relationship" between the state and the private party.

The case law under each of these situations will be discussed separately before applying them to the facts of these cases.

### 1. *State Command or Encouragement of Private Action*

A state will be held responsible for "private" action only if the state has placed its "imprimatur" on the challenged action "so as to make it 'state' action for purposes of the Fourteenth Amendment". *Blum, supra,* p 1003. The state places its "imprimatur" upon "private action" when it "commands or encourages" the questioned activity. However, "command or encourage" is a term of art.

"[United States Supreme Court] precedents indicate that a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. * * * [But] [m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State

responsible for those initiatives under the terms of the Fourteenth Amendment". *Blum,* pp 1004-1005.

The precedent upon which the United States Supreme Court makes this statement illuminates the statement, which might otherwise offer only dark and abstruse conclusions.

In *Jackson v Metropolitan Edison Co, supra,* Metropolitan Edison, a public utility, filed a general tariff statement with the Pennsylvania Public Utility Commission which regulates all public utilities in Pennsylvania. Included in Metropolitan Edison's general tariff statement were a series of provisions which allowed the utility to discontinue service to nonpaying customers following reasonable notice. Pursuant to these provisions, Metropolitan Edison discontinued the plaintiff's utility service. She sued, alleging a violation of the due process requirements of the Fourteenth Amendment. However, the United States Supreme Court found that the Fourteenth Amendment was not implicated since, despite the fact that the deprivation procedure was "passed" by the state public utility commission, there was no "state action". As the United States Supreme Court stated:

"Here, on the other hand, there was no such imprimatur placed on the practice of Metropolitan about which petitioner complains. The nature of governmental regulation of private utilities is such that a utility may frequently be required by the state regulatory scheme to obtain approval for practices a business regulated in less detail would be free to institute without any approval from a regulatory body. Approval by a state utility commission of such a request from a regulated utility, where the Commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility

and approved by the Commission into 'state action'. At most, the Commission's failure to overturn this practice amounted to no more than a determination that a Pennsylvania utility was authorized to employ such a practice if it so desired. Respondent's exercise of the choice allowed by state law where the initiative comes from it and not from the State, does not make its action in doing so 'state action' for purposes of the Fourteenth Amendment." *Jackson, supra,* p 357.

In *Flagg Bros, Inc v Brooks,* 436 US 149; 98 S Ct 1729; 56 L Ed 2d 185 (1978), the United States Supreme Court found that there was no state action when Flagg Brothers, a bailor-warehouse, sold plaintiff's goods pursuant to a New York Uniform Commercial Code provision allowing "self-help" sales.[3] The provision under which Flagg Brothers acted delineated the situations in which "self-help" was available and prescribed the exact manner in which the sale was to be carried out. The plaintiff, whose goods were sold by Flagg Brothers, sued, alleging that the sale violated due process since Flagg Brothers was acting at the

---

[3] Justice CAVANAGH declares:

"Second, although it is not a truly distinguishing feature, it appears to me that the United States Supreme Court was wrong in concluding that the procedures outlined in UCC 7-210 to enforce a warehouse-man's lien did not involve state action. Indeed, that conclusion did not easily or naturally follow from its prior case law. See *Flagg Bros, supra,* pp 168-179 (Stevens, J., *dissenting)". Post,* 482.

The plaintiffs raise an objection to the MMAA based upon the federal Due Process Clause. In evaluating that claim, this Court is bound by the decisions of the United States Supreme Court. "[T]he decisions of [the United States Supreme Court], in cases involving Federal questions, are conclusive authorities in the State courts". *Provident Institution v Massachusetts,* 73 US (6 Wall) 611, 628; 18 L Ed 907 (1867). This rule has continued to the present. See *Fletcher v Weir,* 455 US 603; 102 S Ct 1309; 71 L Ed 2d 490 (1982). Therefore, we cannot agree with our brother CAVANAGH that we are free to disregard the majority decision in *Flagg Bros, supra,* because we might think that "the United States Supreme Court was wrong" in favor of the dissenting position of Justice Stevens. Moreover, that Court, not this one, is the final arbiter concerning the scope of federal constitutional rights.

"command or encouragement" of the state. The
Supreme Court, however, disagreed:

> "Our cases state 'that a State is responsible for the
> * * * act of a private party when the State, by its law,
> has compelled the act.' * * * This Court, however, has
> never held that a State's mere acquiescence in a private
> action converts that action into that of the State. The
> Court rejected a similar argument in *Jackson* [p 357]:
>
> " 'Approval by a state utility commission of such a
> request from a regulated utility, where the commission
> has not put its own weight on the side of the proposed
> practice by *ordering it,* does not transmute a practice
> initiated by the utility and approved by the commission
> into "state action." (Emphasis added.)'
>
> *      *      *
>
> "[Likewise,] the State of New York is in no way
> responsible for Flagg Brothers' decision, a decision
> which the State in § 7-210 permits but does not compel,
> to threaten to sell these respondents' belongings.
>
> "Here, the State of New York has not compelled the
> sale of a bailor's goods, but has merely announced the
> circumstances under which its courts will not interfere
> with a private sale. Indeed, the crux of respondents'
> complaint is not that the State *has* acted, but that it
> has *refused* to act. This statutory refusal to act is no
> different in principle from an ordinary statute of limita-
> tions whereby the State declines to provide a remedy
> for private deprivations of property after the passage of
> a given period of time." *Flagg Bros, supra,* pp 164-166.

Finally, and most recently, in *Blum, supra,* the
United States Supreme Court held that nursing
home decisions to alter the level of care of Medi-
caid patients and thus affect their Medicaid bene-
fits does not involve state action despite the fact
that the state has an interest in and oversees the
nursing home determinations. After noting that
"[f]aithful adherence to the 'state action' require-
ment of the Fourteenth Amendment requires care-

ful attention to the gravamen of the plaintiff's complaint", *Blum, supra,* p 1003, the United States Supreme Court declared:

"[T]he Court of Appeals' finding of state action cannot stand. The court reasoned that state action was present in the discharge or transfer decisions implemented by the nursing homes because the State responded to those decisions by adjusting the patient's Medicaid benefits. Respondents, however, do not challenge the adjustment of benefits, but the discharge or transfer of patients to lower levels of care without adequate notice or hearings. That the State responds to such actions by adjusting benefits does not render it *responsible* for those actions. The decisions about which respondents complain are made by physicians and nursing home administrators, all of whom are concededly private parties. There is no suggestion that those decisions were influenced in any degree by the State's obligation to adjust benefits in conformity with changes in the cost of medically necessary care.

"* * * [Additionally, the respondents] argue that the State 'affirmatively commands' the summary discharge or transfer of Medicaid patients who are thought to be inappropriately placed in their nursing facilities. Were this characterization accurate, we would have a different question before us. However, our review of the statutes and regulations identified by respondents does not support respondents' characterization of them." *Blum, supra,* p 1005.

The Court supported its conclusion as follows:

"We cannot say that the State, by requiring completion of a form, is responsible for the physician's decision.

"In any case, respondents' complaint is about nursing home decisions to discharge or transfer, not to admit, Medicaid patients. But we are not satisfied that the State is responsible for those decisions either.

* * *

"[State] regulations do not require the nursing homes to rely on the forms in making discharge or transfer decisions, nor do they demonstrate that the State is responsible for the decision to discharge or transfer particular patients. Those decisions ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State." *Blum, supra,* pp 1006-1008.

Therefore, to constitute state "command or encouragement" or state "imprimatur", the state's action must be more prominent and pervasive than that present in *Jackson, Flagg Bros,* or *Blum.* To the extent that the state's involvement is equal to or less than that in those cases, there is no "state action" for Due Process Clause purposes.

## 2. *Performance of a Traditionally Exclusively Governmental Function*

"State action" of Due Process Clause magnitude is also present where a private person is performing "traditionally exclusively governmental functions". As with "imprimatur" state action, "traditionally the exclusive prerogative of the State", state action is best understood through its application in specific cases.

In *Jackson, supra,* pp 352-353, the Pennsylvania Public Utility Commission case, the United States Supreme Court held that the public utility did not exercise a state power which was traditionally exclusively a governmental function.

"If we were dealing with the exercise by Metropolitan of some power delegated to it by the State which is traditionally associated with sovereignty, such as eminent domain, our case would be quite a different one. But while the Pennsylvania statute imposes an obligation to furnish service on regulated utilities, it imposes

no such obligation on the State. The Pennsylvania courts have rejected the contention that the furnishing of utility services is either a state function or a municipal duty. * * *

"Perhaps in recognition of the fact that the supplying of utility service is not traditionally the exclusive prerogative of the State, petitioner invites the expansion of the doctrine of this limited line of cases into a broad principle that all businesses 'affected with the public interest' are state actors in all their actions.

"We decline the invitation."

Since the provision of utility service is *not* a state governmental function, it cannot be either traditional or exclusive as required for state action under the Due Process Clause.

In *Flagg Bros, supra,* pp 158-163, the bailor-warehouse sale case, the United States Supreme Court again held that there was no violation of the Due Process Clause because there was no "state action". Specifically, the Supreme Court refused to hold that the private resolution of disputes was a "traditionally exclusively governmental function". It noted that while "many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State'". While the Supreme Court recognized that Flagg Brothers acted pursuant to a state statute which detailed a course of action, the Court held that the statutory "system of rights and remedies, recognizing the traditional place of private arrangements in ordering relationships in the commercial world, can hardly be said to have delegated to Flagg Brothers an exclusive prerogative of the sovereign". The Supreme Court obviously was not impressed with the argument that the rights were created by state statute, so it held that "our sovereign-function cases do not support a finding of state action here". Here, the United States Su-

preme Court placed emphasis on the exclusive nature of the challenged action.

Finally, in *Blum, supra,* p 1011, the nursing-home care case, the United States Supreme Court refused to find that the nursing homes performed functions which were traditionally and exclusively governmental functions.

"Respondents' argument in this regard is premised on their assertion that both the Medicaid statute and the New York Constitution make the State responsible for providing every Medicaid patient with nursing home services. The state constitutional provisions cited by respondents, however, do no more than authorize the legislature to provide funds for the care of the needy. * * * They do not mandate the provision of any particular care, much less long-term nursing care. Similarly, the Medicaid statute requires that the States provide funding for skilled nursing services as a condition to the receipt of federal monies. * * * It does not require that the States provide the services themselves."

Therefore, to find state action based upon a private party exercising sovereign powers, the powers exercised must be both traditionally and exclusively the power of government. As noted in *Flagg Bros,* while "many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State'". *Flagg Bros, supra,* p 158. The challenged action must satisfy both requirements to constitute "state action" of Due Process Clause magnitude.

### 3. *Interdependent Symbiotic Relationship*

Finally, the "state action"/"private action" nexus is formed where the state and the private entities have a mutually dependent or symbiotic relationship. The Supreme Court created this basis

for finding state action in *Burton v Wilmington Parking Authority,* 365 US 715; 81 S Ct 856; 6 L Ed 2d 45 (1961). The Court has applied the test, but has not found that it was met in three other cases: *Moose Lodge No 107 v Irvis,* 407 US 163; 92 S Ct 1965; 32 L Ed 2d 627 (1972), *Jackson, supra,* and *Blum, supra.*

In *Burton,* the state parking authority built a parking facility which included commercial shop space which private parties could rent from the parking authority. One of the parking authority's lessees ran a restaurant which served only white persons. After noting that the parking authority relied very heavily on the shop rental funds to pay for the facility and that the parking authority could have prohibited the discrimination by lease provision, the Supreme Court stated:

"By its inaction, the Authority, and through it the State, has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination. The State has so far insinuated itself into a position of interdependence with Eagle [the restaurant] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." *Burton, supra,* p 725.

In the more than 20 years since *Burton,* the Supreme Court has not found another "symbiotic" relationship constituting "state action". In *Moose Lodge, supra,* the Court discussed whether a symbiotic relationship existed where the state liquor commission gave a liquor license to a racially discriminatory club. It decided that there was no "state action" since "there is nothing approaching the symbiotic relationship between lessor and les-

see that was present in *Burton"*. *Moose Lodge,*
*supra,* p 175. The Supreme Court in *Jackson,*
*supra,* also reviewed the symbiotic relationship
test and applied it to the regulation of a public
utility. As in *Moose Lodge,* the Court found "ab-
sent in the instant case the symbiotic relationship
presented in *Burton"*. *Jackson, supra,* p 357. In
*Blum, supra,* pp 1010-1011, the Court reviewed the
nursing home case for any symbiotic relationship
between the state and the nursing home.

"Finally, respondents advance the rather vague gen-
eralization that such a relationship exists between the
State and the nursing homes it regulates that the State
may be considered a joint participant in the homes'
discharge and transfer of Medicaid patients. * * * Re-
spondents argue that State subsidization of the operat-
ing and capital costs of the facilities, payment of the
medical expenses of more than 90% of the patients in
the facilities, and the licensing of the facilities by the
State, taken together convert the action of the homes
into 'state' action. But accepting all of these assertions
as true, we are nonetheless unable to agree that the
State is responsible for the decisions challenged by
respondents. As we have previously held, privately
owned enterprises providing services that the State
would not necessarily provide, even though they are
extensively regulated, do not fall within the ambit of
*Burton.*"

The symbiotic-relationship basis for attributing
private action to the state is therefore the most
limited of the three bases. The Supreme Court has
not found it present in any recent case.

III. Application of the State Action Tests to
the Facts of These Cases

A. *State Command or Encouragement of Private*
*Action*

As indicated above, the plaintiffs object on due

process grounds to the state's enforcement of their
private arbitration agreement since the agreement
complies with the MMAA provisions regulating
the arbitration process. The issue is whether the
state has "commanded or encouraged" or placed
its "imprimatur" on the private actions so as to
transform them into "state actions".

It is uncontroverted that the state, by enacting
the MMAA, does not require anyone to arbitrate.
It does, however, establish and regulate an accept-
able process of arbitration of medical malpractice
claims. In effect, the state enforces the private
decision to elect complying arbitration over tradi-
tional litigation. In doing so, the state sets the
standard for enforceable arbitration agreements in
medical malpractice cases and establishes the ac-
ceptable procedure for medical malpractice arbi-
tration. The question is whether such action con-
stitutes "command and encouragement" sufficient
to attribute the private parties' agreement to arbi-
trate according to state law to the state.

The answer, we think, according to analogous
United States Supreme Court cases, is clearly no.
In providing that if a private person elects to
arbitrate a medical malpractice claim the claim
shall be heard by a three-member panel which
includes a doctor or a hospital administrator, the
statute does not constitute state action through
"command or encouragement". The result is the
same whether one relies primarily upon *Flagg
Bros, Jackson,* or *Blum.*

In *Flagg Bros,* the state enacted a statute which
provided that an individual bailee could sell a
bailor's property to pay an overdue bill if the
bailee complied with the statute by giving notice,
holding the sale in a particular way, and meeting

other requirements. The state did not require that the bailee sell the bailor's goods; it only provided that the bailee could elect to do so without intervention by the state. But, when the bailee sold the bailor's goods, the state would not use its courts to correct the sale or punish the bailor.[4] As the United States Supreme Court noted:

"Here, the State of New York has not compelled the sale of a bailor's goods, but has merely announced the circumstances under which its courts will not interfere with a private sale. Indeed, the crux of respondents' complaint is not that the State *has* acted, but that it has *refused* to act. This statutory refusal to act is no different in principle from an ordinary statute of limitations whereby the State declines to provide a remedy for private deprivations of property after the passage of a given period of time." *Flagg Bros, supra,* p 166.

In the cases before us, the state has not compelled the private parties to arbitrate before a panel composed of a lawyer, a doctor or hospital administrator, and a layperson. Instead, it has created a system which private persons may elect to use. If arbitration is elected, and if there is compliance with the statute, the state will not allow a party to void the arbitration agreement by suing in an ordinary civil action. To *paraphrase* the United States Supreme Court in *Flagg Bros:*

---

[4] Justice CAVANAGH would distinguish *Flagg Bros* on the further basis that the plaintiff in *Flagg Bros* did not challenge the procedure afforded by the state statute, but only challenged the state court's refusal to intervene, while in this case the plaintiffs challenge the procedure afforded by the state statute. This "distinction" is incorrect. As the United States Supreme Court said in *Flagg Bros,* "[the plaintiff] initiated this class action * * * seeking * * * [a] declaration that such a sale pursuant to § 7-210 would violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment". It is therefore clear that the plaintiff in *Flagg Bros* was indeed challenging the procedure afforded by the state statute.

*Here, the State of Michigan has not compelled the parties to arbitrate their disputes concerning medical malpractice, but has merely announced the circumstances under which its courts will not interfere with a private agreement to arbitrate medical malpractice disputes. Indeed, the crux of plaintiffs' complaint is not that the state has acted, but that the state has refused to act to prohibit private agreements to arbitrate before a three-person panel, one of whom is a doctor or a hospital administrator. The statutory refusal to act is no different than an ordinary statute of limitations by which the state declines to provide a civil trial remedy for medical malpractice after the passage of a given period of time.*

In *Jackson, supra,* p 357, the United States Supreme Court held that the public utility acted "privately" when it cut off plaintiff's service despite the fact that the state had approved the practice when it approved the utility's general tariff.

"At most, the Commission's failure to overturn this practice amounted to no more than a determination that a Pennsylvania utility was authorized to employ such a practice if it so desired. Respondent's exercise of the choice allowed by state law where the initiative comes from it and not from the State, does not make its action in doing so 'state action' for purposes of the Fourteenth Amendment."

As applied to these cases, *Jackson* supports the conclusion that the State of Michigan, through the MMAA, merely afforded an alternative to private parties who have medical malpractice disputes. The initiative to accept the state-regulated medical malpractice arbitration system does not constitute "state action". It merely constitutes a private choice which is permitted and, if chosen, is enforced by the state.

Finally, in *Blum, supra,* p 1005, the United
States Supreme Court explicitly distinguished be-
tween state response to private actions and state
responsibility for private actions.

"That the State responds to such actions by adjusting
benefits does not render it *responsible* for those actions.
The decisions about which respondents complain are
made by physicians and nursing home administrators,
all of whom are concededly private parties. There is no
suggestion that those decisions were influenced in any
degree by the State's obligation to adjust benefits in
conformity with changes in the cost of medically neces-
sary care."

Here, the state certainly responds to private
decisions to arbitrate medical malpractice claims.
Those which conform with the state's statutory
standard are enforced; those which do not conform
with the statutory standard are not enforced. This
is not, however, a situation in which the state is
responsible for the private decision. Whether pri-
vate parties choose to arbitrate and what terms
they agree upon are not controlled by the state.
Private parties may do as they please. However,
the state responds according to its stated position
which is articulated in the MMAA. The decisions
about which the plaintiffs complain, whether to
arbitrate and the composition of the arbitration
panel, are private decisions of private parties.
There is no suggestion that those decisions are
mandated in any degree by the state's decision to
enforce medical malpractice arbitration agree-
ments which comport with the MMAA.

Therefore, there is no "imprimatur" or "com-
mand or encouragement" state action in these
cases. The state's regulation of medical malprac-
tice arbitration does not alter this conclusion. For

purposes of the Fourteenth Amendment, the
state's enforcement of or response to private deci-
sions does not constitute "state action".

### B. *Performance of a Traditionally Exclusively Governmental Function*

The private choice to arbitrate as allowed by
state law does not constitute private performance
of a "traditionally exclusively governmental func-
tion". While resolution of private disputes has
traditionally been performed by the state through
its courts, the state was not the only entity per-
forming private dispute resolution. As the United
States Supreme Court recognized, a statutory "sys-
tem of rights and remedies, recognizing the tradi-
tional place of private arrangements in ordering
relationships in the commercial world, can hardly
be said to have delegated to [the private party] an
exclusive prerogative of the sovereign". *Flagg
Bros, supra,* p 160. There the state allowed self-
help sales in bailor-bailee situations; here the state
allows and enforces private agreements to arbi-
trate. In both cases, the method of self-help or
arbitration is closely regulated. But, the fact re-
mains that the state has not and is not the exclu-
sive decisionmaker concerning private disputes.
This is another instance which proves correct the
Supreme Court's statement that while "many
functions have been traditionally performed by
governments, very few have been 'exclusively re-
served to the State'." *Flagg Bros, supra,* p 158.

Private civil dispute resolution is not a tradition-
ally exclusively governmental function for which
the state's acquiescence in performance by private
parties constitutes state action. The deprivation
occurs because of a private decision which does not

constitute the performance of a governmental function.

## C. *Symbiotic Relationship*

The private decision to arbitrate as allowed by the MMAA does not create a symbiotic relationship between the state and the private parties to the arbitration agreement. The state's relationship with the private decision is merely to enforce the private decisions which are in accordance with state law.

In *Blum, supra,* p 1010, the United States Supreme Court held that no such

"relationship exists between the State and the nursing homes it regulates that the State may be considered a joint participant in the homes' discharge and transfer of Medicaid patients."

The Court found no relationship even though the state subsidized the capital and operating expenses of the nursing homes, the state paid for the medical expenses of 90% of the nursing home patients, and the state licensed the nursing homes.

In these cases, the state's participation in the challenged activity does not reach the level of regulation and subsidization involved in *Blum,* let alone the level of lessor-lessee involved in *Burton.* The state's relationship to the activity challenged in these cases is like that in *Jackson* and *Flagg Bros.* The state allows or enforces the private decision, but does not seek direct benefit from the challenged activity. Therefore, there is no symbiotic relationship "state action" in these cases.

## D. *Conclusion*

We conclude, therefore, that since there is no

"state action" of Fourteenth Amendment proportions in these cases, the Fourteenth Amendment's due process concerns are not implicated. Consequently, we need not consider whether there is a constitutionally cognizable life, liberty, or property interest, or whether there is a deprivation without due process of law. The MMAA, with its requirement that a doctor or hospital administrator sit on the arbitration panel, does not deprive the plaintiffs of an impartial decisionmaker in violation of the Fourteenth Amendment.[5]

---

[5] Our brother CAVANAGH contends that if we find that the MMAA does not involve state action, we must also conclude that judicial promulgation, use, and enforcement of court rules regulating proceedings in our courts does not involve state action. We respectfully suggest that such a conclusion is unsound for three reasons:

First, our colleague focuses narrowly upon a single factor of the state-action analysis. That factor, whether the state promulgates the rules controlling the party's challenged actions, is relevant but not controlling in the state-action analysis. As is evident from *Flagg Bros* and *Blum*, the state may promulgate rules under which private parties act without automatically transforming private action into state action. Likewise, as is evident in the "traditionally exclusively governmental function" cases and the "interdependent symbiotic relationship" cases, the absence of state-promulgated rules regulating private action will not prevent private action from rising to the level of state action. Therefore, the presence or absence of state-promulgated rules is not the distinguishing characteristic which differentiates state action from private action.

Instead of being the sole and controlling factor as our colleague appears to assume, promulgation by the state of rules regulating the challenged private action is merely one factor which must be considered in light of other relevant factors. It is these other factors, together with the fact of state rule promulgation, which determine whether or not private action pursuant to state-promulgated rules is regarded as state action. Among the other factors are:

1) the content and scope of the rules themselves,

2) whether the rules require or merely allow private action,

3) whether the rules are carried out and enforced by the state or someone else who is not related to the state,

4) whether the rules provide for or require active state involvement or merely involve state involvement at the promulgation stage.

In focusing only upon the fact that the state promulgated the rules, our colleague fails to suggest a context in which to determine whether the challenged private action should be treated like state action.

Second, we think our colleague misinterprets the purpose of our analysis. In this case, the Court was required to determine whether or not private action (arbitration pursuant to the MMAA) rose to the level of state action so as to violate due process. In our colleague's hypothesis (promulgation, use, and enforcement of court rules), the Court would not be required to determine whether or not private action rose to the level of state action. Rather, in the hypothetical case, the challenged actions would be the direct action of a branch of state government and would not require vicarious ascription to the state. The action would be state action of a branch of state government because the court rules are not self-enforcing; they do not have authority independent of a court decision or order, and they are intended to regulate the actions of the judicial branch of state government and the actions of private parties before the judicial branch of state government. Therefore, in the hypothesis, the issue would not require application of our present analysis since where state action is clearly present, there is no occasion to determine whether private action rises to the level of state action.

Third, even if one were somehow able to concoct a hypothesis in which the application of a court rule allegedly deprived a person of due process or equal protection without any direct state action (court order or court proceeding), our analysis in this case would not inevitably require a finding in the hypothetical case that there was no state action. As the United States Supreme Court acknowledged in *Jackson, supra,* pp 349-350, the determination whether a challenged action is private or state "frequently admits of no easy answer". Therefore, the decision whether private action rises to the level of state action necessarily turns upon the particular facts of the case. As we have indicated, the facts necessarily include those relevant "other" factors as well as whether the state promulgated the rules regulating the challenged private conduct. Obviously, both this case and our colleague's hypothetical case involve rules promulgated by the state. The "other" factors, however, demonstrate that this case (MMAA) and the hypothetical case (court rules) differ in several significant ways:

1) In both cases, the state-promulgated rules regulate a dispute resolution process. In the MMAA case, both parties mutually agree upon the forum. In the court rules case, only one party chooses the forum (as a general rule).

2) Both cases involve a dispute resolution forum. In the MMAA case, the forum is independently administered. In the court rules case, the forum is a branch of state government administered by the state.

3) In the MMAA case, the forum exists because parties mutually agree to use it. In the court rules case, the forum is constitutionally mandated. Const 1963, art 6, § 1.

4) In the MMAA case, the state does not involve itself in the forum beyond promulgating the rules for its use. In the court rules case, the state is the forum.

5) In the MMAA case, the state promulgates the rules, then stays its hand. In the court rules case, the state promulgates the rules and then affirmatively acts to enforce them.

## IV

The plaintiffs have raised three additional challenges to the enforcement of the arbitration agreements they signed. They contend, first, that the arbitration agreements should not be enforced because they are contracts of adhesion. Second, they contend that the arbitration agreements should not be enforced since they involve constructive fraud. Third, they contend that the arbitration agreements should not be enforced since the defendants have not carried their burden of proof that the plaintiffs voluntarily, intelligently, and knowingly waived their right to a jury trial. We reject all three contentions.

## A

A contract of adhesion is a contract which has some or all of the following characteristics: the parties to the contract were of unequal bargaining strength; the contract is expressed in standardized language prepared by the stronger party to meet his needs; and the contract is offered by the stronger party to the weaker party on a "take it or leave it" basis. *Zurich Ins Co v Rombough*, 384

---

While these factual differences might or might not lead to a finding of state action in the unusual hypothetical case in which the court rules affect a private person without any direct state action, that case is not presently before the Court and the United States Supreme Court has said that the scope of the Due Process Clause should be determined by a "gradual process of judicial inclusion and exclusion" in actual cases. *International Brotherhood of Teamsters, Local 695, AFL v Vogt, Inc*, 354 US 284, 287; 77 S Ct 1166; 1 L Ed 2d 1347 (1957), citing *Davidson v New Orleans*, 96 US 97, 104; 24 L Ed 616 (1877).

In the last analysis, however, it is not our disagreement with our colleague which is determinative of the issue. The fact is that the United States Supreme Court, which is exclusively empowered to define the scope of state action under the Fourteenth Amendment, has declared in *Flagg Bros* and *Blum* that state promulgation of rules, without more, does not automatically amount to state action.

Mich 228, 232-233; 180 NW2d 775 (1970). There-
fore, the essence of a contract of adhesion is a
nonconsensual agreement forced upon a party
against his will.

As is obvious, the arbitration agreements in-
volved in this case do not satisfy any of the charac-
teristics of contracts of adhesion. First, the arbitra-
tion agreements are not contracts between parties
with unequal bargaining power. The plaintiffs
were free to accept or reject the contract without
any negative consequences since the agreements
must *explicitly* and *clearly* provide that "[t]his
agreement to arbitrate is not a prerequisite to
health care or treatment". Moreover, even after
the plaintiffs signed the arbitration agreements,
they were free to revoke the agreements within 60
days since the agreement "may be revoked within
60 days after execution by notification in writing
to: Medical Records Director". Consequently, the
arbitration agreements signed by the plaintiffs do
not involve the unequal bargaining power charac-
teristic of contracts of adhesion. Second, while the
arbitration agreements are expressed in standard-
ized language, their essential provisions are not
written by the defendants nor are they designed
for the exclusive benefit of the defendants. Rather,
the Legislature determined the essential provi-
sions of the arbitration agreements to provide a
fair alternative to medical malpractice litigation.
Third, while the arbitration agreements were of-
fered to the plaintiffs on a yes or no basis, they
were not offered on what would traditionally be
considered a "take it or leave it" basis. The arbi-
tration agreements were not a necessary prerequi-
site to health care and were not offered to the
plaintiffs under any threat of negative conse-
quences for deciding not to sign the arbitration
agreements. The plaintiffs were free to accept the

contracts with an option to reject them within 60 days or to reject them with the opportunity to enter into arbitration later by agreement.

Therefore, the arbitration agreements involved in these cases are not contracts of adhesion.

## B

This Court has defined constructive fraud as "receipt and retention of unmerited benefits". *Goodrich v Waller,* 314 Mich 456, 469; 22 NW2d 862 (1946). The unmerited benefit is generally obtained as a result of the breach of a legal or equitable duty. In this case, the plaintiffs contend that the defendants are guilty of constructive fraud since the arbitration agreements did not disclose the composition of the arbitration panel, did not disclose the attitudes and biases of persons in the medical profession against plaintiffs in medical malpractice cases, and did not disclose the relationship between medical malpractice awards and medical malpractice insurance costs. The plaintiffs believe that these nondisclosures constitute an "unmerited benefit" which makes their arbitration agreements unenforceable. We disagree.

We note at the outset that the composition of the arbitration panel was disclosed to the plaintiffs in the booklet which must accompany a valid arbitration agreement. Therefore, that portion of the plaintiffs' argument does not support a finding of constructive fraud. Additionally, the plaintiffs do not provide any legal support for their contention that the defendants were under a legal or equitable duty to disclose the attitudes of doctors in general, the biases of the medical profession against plaintiffs in medical malpractice cases, or

the effect of medical malpractice arbitration
awards as opposed to medical malpractice litiga-
tion awards upon medical malpractice insurance
rates. Finally, we do not accept the plaintiffs'
unsupported blanket assertion of professional bias
rising to the level of constructive fraud.

Therefore, the arbitration agreements involved
in these cases are not based upon unconscionable
constructive fraud.

## C

Finally, we reject the plaintiffs' contention that
their arbitration agreements are unenforceable
since the defendants did not adequately prove that
the plaintiffs voluntarily, intelligently, and know-
ingly waived their constitutional right to jury
trial. In rejecting the plaintiffs' contention, we do
not reach the merits of their argument. We reject
it instead because the argument was not raised in
the trial court, in the Court of Appeals, or in this
Court in the plaintiffs' applications for leave to
appeal. It is axiomatic that an issue not properly
raised and preserved will not ordinarily be consid-
ered on appeal in this Court. *Dale v Whiteman,*
388 Mich 698; 202 NW2d 797 (1972); *Gordon Gross-
man Building Co v Elliott,* 382 Mich 596; 171
NW2d 441 (1969); *Therrian v General Laborator-
ies, Inc,* 372 Mich 487; 127 NW2d 319 (1964). This
is, or course, a general rule. However, we reject
the application of the *Johnston v Michigan Consol-
idated Gas Co,* 337 Mich 572, 580; 60 NW2d 464
(1953), exception to the facts of these cases. The
*Johnston* exception, which was without authority
when announced, and which has not until today
been cited by this Court since it was laid down 30
years ago, should not be expanded and applied to
this case.

V

The judgment of the Court of Appeals is reversed in *Jackson v Detroit Memorial Hospital* and the case is remanded to the trial court for action consistent with this opinion.

The judgment of the Court of Appeals is affirmed in *Morris v Metriyakool.*

The MMAA is constitutional and the arbitration agreements signed by the plaintiffs are not contracts of adhesion, are not unconscionable, and do not involve unconstitutional irrebuttable presumptions.

BRICKLEY, J., concurred with RYAN, J.

CAVANAGH, J. *(dissenting).* The central issue in these two cases is whether the Due Process Clauses of the United States Constitution,[1] and the Michigan Constitution,[2] which bar the state from depriving any person of life, liberty, or property without due process of law, are violated by the medical malpractice arbitration act of 1975, MCL 600.5040 *et seq.;* MSA 27A.5040 *et seq.* I am persuaded that they are because the act unconstitutionally deprives these plaintiffs of their due process rights to a fair hearing before an impartial decisionmaker.[3]

Accepting in principle the analytical approach

---

[1] US Const, Am XIV.

[2] Const 1963, art 1, § 17.

[3] I am not unmindful of the fact that I participated in the decisions in *Williams v O'Connor,* 108 Mich App 613; 310 NW2d 825 (1981), and *Cushman v Frankel,* 111 Mich App 604; 314 NW2d 705 (1981), both of which upheld the constitutionality of the act in question. However, in *Bowman v Lutz,* 123 Mich App 733, 735; 333 NW2d 346 (1983), I indicated I was reconsidering my position in light of Judge KAUFMAN'S very persuasive reasoning in *Murray v Wilner,* 118 Mich App 352; 325 NW2d 422 (1982). Having revisited these opinions and others, I am now persuaded that my prior view upholding the statute was incorrect.

advanced by my brother RYAN, I am convinced that (1) plaintiffs have been deprived of the constitutionally cognizable right to a fair hearing before an impartial decisionmaker, (2) because of state action, (3) without due process of law.[4]

I

While it is difficult to know whether to classify the right to a fair hearing before an impartial decisionmaker as a liberty or property right, there can be no doubt that it is a constitutionally cognizable right. Indeed, a basic tenet of due process is that decisionmakers must be unbiased and impartial.[5] As the Supreme Court stated in *In re Murchison,* 349 US 133, 136; 75 S Ct 623; 99 L Ed 942 (1955):

"A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that 'every procedure which would offer a possible temptation to the average man as a judge * * * not to hold the

[4] In contrast to the test set forth by my brother RYAN, see *ante,* p 452, I believe that the relevant analysis should proceed in the following order, *i.e.,* there must be:

1) a deprivation of a constitutionally cognizable life, liberty, or property interest;

2) by the state or a private person who may be fairly treated as the state;

3) without due process of law.

[5] *Tumey v Ohio,* 273 US 510, 532; 47 S Ct 437; 71 L Ed 749; 50 ALR 1243 (1927); *Crampton v Dep't of State,* 395 Mich 347, 351; 235 NW2d 352 (1975).

balance nice, clear and true between the State and the accused, denies the latter due process of law.' *Tumey v Ohio,* 273 US 510, 532; 47 S Ct 437; 71 L Ed 749; 50 ALR 1243 (1927). Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.' *Offutt v United States,* 348 US 11, 14; 75 S Ct 11; 99 L Ed 11 (1954)."

Thus, the potential for actual bias on the part of the decisionmaker may be too great in some circumstances for our system of justice to risk, despite the fact that such potential might never be realized.

One situation which presents too great a probability of actual bias is when the decisionmaker has a direct or substantial pecuniary interest in the outcome of the controversy. *Crampton v Dep't of State,* 395 Mich 347, 351; 235 NW2d 352 (1975). This is what the plaintiffs claim exists here, *i.e.,* that a health-care provider who must decide a medical malpractice case will be inclined to minimize the size of any award because the number and size of malpractice awards directly affect the availability and cost of medical malpractice insurance coverage.[6]

There is no dispute that the medical malpractice arbitration act was the legislative response to an alleged malpractice insurance crisis which supposedly resulted from the spiraling costs of insurance coverage for health-care providers and the reduc-

---

[6] The affidavits of experienced underwriters of medical malpractice insurance, which are part of this record, specifically aver that any malpractice award in favor of a plaintiff affects the availability and cost of malpractice insurance coverage and thus any health-care provider would have a direct and substantial interest in the outcome of arbitrated malpractice cases.

tion in actual availability of such coverage.[7] Submission of malpractice controversies to arbitration was perceived as a way to reduce the costs of such disputes because arbitration is less complicated and quicker than litigation and usually results in a decision that is final. A reduction in the costs of bringing malpractice disputes to a resolution was to then result in a reduction in the costs of malpractice insurance coverage for health-care providers. However, since the relationship between malpractice controversies and malpractice insurance rates is so direct, it is clear that a reduction in the number and size of malpractice awards, in addition to a reduction in the costs of resolving such disputes, would be of substantial benefit to those paying for the cost of malpractice insurance coverage.

The cost of malpractice insurance premiums has a significant effect on a health-care provider's ability to practice in the medical profession. If the number and size of malpractice awards directly affect the cost of these premiums so that the premiums are more costly after an increase in the number and size of such awards, then health-care providers have a direct pecuniary interest in seeing that the number and size of malpractice awards remain small, and they have the opportunity to further this interest when they sit as decisionmakers in medical malpractice cases.

The fact that the direct effect of a particular malpractice award upon a single health-care provider's insurance rate may be minimal does not

---

[7] See, e.g., Redish, *Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications,* 55 Tex L Rev 759 (1977); Abraham, *Medical Malpractice Reform: A Preliminary Analysis,* 36 Md L Rev 489 (1977); Comment, *Michigan's Medical Malpractice Legislation—Prognosis: Curable Defects,* 55 U of D J of Urban Law, p 309 (1978).

make the health-care provider's potential for bias on the basis of a pecuniary interest remote enough to be constitutionally permissible. Since the overall effect of malpractice claims and awards significantly affects insurance rates, the threat of a subliminal systematic bias exists in the medical profession. This results in a temptation for the medical-member decisionmaker to forget the requisite burden of proof and fail to hold the balance true and clear between the adverse parties.[8]

The interests of health-care providers may vary according to the situation in which they find themselves. When a patient is sick and in need of treatment, the health-care provider's interests are clearly not adverse to the patient. At this point the patient's welfare is undoubtedly of paramount importance to the members of the medical profession. However, in a malpractice case the focus of attention is no longer on how to make the patient well; rather, it is on whether the patient is entitled to compensation for any mistreatment received from a member of the medical profession and, if so, the amount of compensation due. Members of the medical profession are no longer in a position to use their skills to improve the patient's health. At this point they are solely in a position of choosing whether to award the patient any money for alleged wrongful medical treatment. I believe that in this situation the interests of the health-care providers in relation to those of the patient change and, in light of the effect a malpractice award may have on their pecuniary interests, the health-care providers may be expected to align themselves with and favor a member of their own profession.[9]

---

[8] *Tumey v Ohio,* 273 US 510, 532; 47 S Ct 437; 71 L Ed 749; 50 ALR 1243 (1927).

[9] As Judge BRONSON noted, concurring and dissenting in *Morris v*

*Metriyakool,* 107 Mich App 110, 128; 309 NW2d 910 (1981):

"In addition, relatively recent cases and articles have commented on the unwillingness among medical practitioners to testify against one another. See, *e.g., Morgan v Rosenberg,* 370 SW2d 685 (Mo App, 1963); *Halldin v Peterson,* 39 Wis 2d 668; 159 NW2d 738 (1968); *L'Orange v Medical Protective Co,* 394 F2d 57 (CA 6, 1968); *Agnew v Parks,* 172 Cal App 2d 756; 343 P2d 118 (1959) (suit was brought against a group of doctors for 'conspiracy to obstruct the ends of justice' for their refusal to testify); Markus, *Conspiracy of Silence,* 14 Cleveland-Marshall L Rev 520 (1965); Seidelson, *Medical Malpractice Cases and the Reluctant Expert,* 16 Cath U L Rev 158 (1966).[9] Problems with the 'conspiracy of silence' have been mitigated over the years. Nonetheless, it is not unrealistic to conclude that anti-plaintiff attitudes continue to exist among large numbers of doctors.[10] As such, there is a strong possibility that the physician on an arbitration panel will be biased.

"[9]In Prosser, Torts (4th ed), p 227, fn 3, the author notes a survey conducted by the Boston University Law-Medicine Research Institute and reported in Medical Economics on August 28, 1961. The survey showed that out of 214 doctors, only 31% of the specialists and 27% of the general practitioners would be willing to testify for the plaintiff if a surgeon, operating on a diseased kidney, removed the wrong one.

"[10]There is a medical community whose members face in their daily efforts to make a living common experiences and risks, including: (1) the possibility of being subjected to a suit for malpractice; (2) inconvenience associated with the defense of such a suit; (3) anxiety associated with a malpractice suit; (4) subjection to increased malpractice costs; and (5) facing the possibility that malpractice insurance cannot be obtained at any cost. It would be the uncommon physician who did not have a bias, either overtly or unconsciously, against a plaintiff alleging medical malpractice."

In addition, Judge Kaufman noted in *Murray v Wilner,* 118 Mich App 352, 362-363; 325 NW2d 422 (1982):

"Survey evidence of physician attitudes indicates that malpractice has been a growing concern. W. Pabst, 'A Medical Opinion Survey of Physicians' Attitudes on Medical Malpractice', Appendix, *Report of Secretary's Comm on Medical Malpractice,* Dep't of Health, Education and Welfare (1973), pp 83-86. In the *Pabst* survey, over 40% of the responding physicians felt that 'the most effective technique for alleviating the malpractice problem' was 'laws limiting such suits' or 'reduced court judgments'. *Id.* A more recent survey of Arizona physicians revealed that fully 75% felt that in 'most malpractice suits, the physician is not at fault'. Brown, 'Arizona Physicians' Attitudes Toward Consumers, Physicians and Health Care', *Arizona Medicine,* March, 1980, pp 174-179. Perhaps more telling is the following excerpt of the statement of Dr. George Northrup to a Department of Health, Education and Welfare commission studying the malpractice problem:

" 'As a physician, I live in an aura of fear—fear of suit. Fear contributes to hostility and rarely contributes to constructive action.

This is not to say that health-care providers as a group are not fair-minded. However, in the context of medical malpractice litigation, their function as arbitrators and their frame of reference may make them partisans of their professional colleagues, producing partisan results. This situation thus presents too high a risk of actual bias on the part of the medical-member decisionmakers to be constitutionally permissible.[10]

In light of this potential for bias on the part of health-care providers deciding malpractice cases, I conclude that the medical malpractice arbitration act's requirement of a health-care provider in the composition of the arbitration panel violates the plaintiffs' constitutional right to a fair hearing before an impartial decisionmaker.

Medicine has some bad doctors and some bad health-care institutions. We are not proud of them, nor do we defend them, and we are concerned with the correction or elimination of that element. Some do not believe that we have this concern, but believe me it is true. It is my opinion that if this were to be corrected overnight, the professional liability problem would remain * * *.

" 'The House of Medicine feels belabored. Medical organizations are trying their best to overcome their deficiencies, but in my opinion, malpractice litigation is not the best incentive to improvement. It places medicine in an adversary position, and hostilities too often result * * *.' "

The foregoing is further evidence of the strong potential for alignment between medical-member decisionmakers and medical-member defendants in malpractice controversies.

[10] While not directly parallel, certain provisions of GCR 1963, 511 evidence a similar concern. In pertinent part GCR 1963, 511.4 provides:

".4 Challenges for Cause. After the examination of prospective jurors is completed and before any juror is sworn, the parties may challenge any juror for cause. Every challenge for cause shall be determined by the court. A juror challenged for cause may be directed to answer every question pertinent to the inquiry. The following are grounds for challenges for cause:

*  *  *

"(12) that the person has a financial interest other than that of a taxpayer in the outcome of the case;

"(13) that the person is interested in a question like the issue to be tried."

## II

With regard to the second step of the relevant inquiry, I believe that, under federal constitutional law, these cases can be distinguished from *Flagg Bros, Inc v Brooks,* 436 US 149; 98 S Ct 1729; 56 L Ed 2d 185 (1978), and *Blum v Yaretsky,* 457 US 991; 102 S Ct 2777; 73 L Ed 2d 534 (1982), *i.e.,* there is impermissible state action present in these cases.

First, as the Supreme Court noted in *Blum,* pp 1003-1004:

"This case is obviously different from those cases in which the defendant is a private party and the question is whether his conduct has sufficiently received the imprimatur of the State so as to make it 'state' action for purposes of the Fourteenth Amendment. See, *e.g., Flagg Bros, Inc v Brooks.* * * * [Nevertheless,] th[o]se types of cases shed light upon the analysis necessary to resolve the present case.

* * *

"[A]lthough the factual setting of each case will be significant, our precedents indicate that *a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. Flagg Bros, Inc v Brooks".* (Emphasis added.)

These cases fall under the above-emphasized language.

Second, although it is not a truly distinguishing feature, it appears to me that the United States Supreme Court was wrong in concluding that the procedures outlined in UCC 7-210 to enforce a warehouseman's lien did not involve state action. Indeed, that conclusion did not easily or naturally

follow from its prior case law. See *Flagg Bros,
supra,* pp 168-179 (Stevens, J., *dissenting).* Further,
the Court could have reached the same result by
finding, and properly so, that the procedures au-
thorized under UCC 7-210 did not deprive the
bailor of a property right absent due process of
law, *i.e.,* that the procedures authorized to enforce
the lien did comply with the constitutional right to
due process. In fact, the latter seems to be the real
reason for the Court's decision.

Third, although there is no initial state action,
*i.e.,* the parties are not compelled to execute an
arbitration agreement, there is state action in the
execution itself and after execution, *i.e.,* the state
requires (1) certain terms to be included in the
agreement, and (2) specific procedures pursuant to
the agreement. Indeed, the enactment of a broad
statutory scheme is an expression of the public
policy of the state and, to this extent, certainly
constitutes "encouragement" of arbitration agree-
ments by the state. As this Court noted in *Shavers
v Attorney General,* 402 Mich 554, 597; 267 NW2d
72 (1978), the Due Process Clause may be invoked
only where there is a sufficiently close nexus be-
tween the action complained of and the state itself
such that the state has significantly involved itself
in the challenged conduct.[11]

---

[11] See also *Cramer v Metropolitan Savings & Loan Ass'n,* 401 Mich
252, 258; 258 NW2d 20 (1977), *reh den* 402 Mich 954 (1977), 402 Mich
959 (1978), 405 Mich 830 (1979), *cert den* 436 US 958; 98 S Ct 3072; 57
L Ed 2d 1123 (1978), *reconsideration den* 417 Mich 1114 (1983), and
*Northrip v Federal National Mortgage Ass'n,* 372 F Supp 594 (ED
Mich, 1974).
Indeed,

"the distinctions between 'permission' and 'compulsion' on the one
hand, and 'exclusive' and 'non-exclusive', on the other, cannot be
determinative factors in state-action analysis. There is no great
chasm between 'permission' and 'compulsion' requiring particular
state action to fall within one or the other definitional camp. Even
*Moose Lodge No 107 v Irvis,* 407 US 163; 92 S Ct 1965; 32 L Ed 2d

Although a medical malpractice claimant's initial choice to execute or not to execute an arbitration agreement will always lead to selection, free from state action, of a voluntary dispute-resolution mechanism: whether to (1) institute a lawsuit, (2) arbitrate the dispute, (3) reach some other settlement or agreement with the alleged wrongdoer, or (4) do nothing, it does not necessarily follow that statutorily mandated procedures imposed pursuant to the mechanism selected are devoid of state action.[12] Indeed, when a medical malpractice claimant elects not to execute an arbitration agreement,

---

627 (1972), * * * recognizes that there are many intervening levels of state involvement in private conduct that may support a finding of state action.[4]

---

"[4]In *Moose Lodge* the Court found state action * * * [although the] regulation was neutral on its face * * * and did not *compel* the Lodge to adopt a discriminatory membership rule." *Flagg Bros, supra,* pp 170-171 (Stevens, J., *dissenting)* (emphasis in original).

---

Rather, the inquiry must focus on "the State's role in defining *and controlling* the * * * relationship". *Id.,* p 174 (emphasis in original).

[12] "Whether termed 'traditional,' 'exclusive,' or 'significant,' the state power to order binding, nonconsensual resolution of a conflict * * * is exactly the sort of power with which the Due Process Clause is concerned. And the State's delegation of that power to a private party is, accordingly, subject to due process scrutiny. * * * The focus is not on the private deprivation but on the state authorization. * * * The State's conduct in this case takes the concrete form of a statutory enactment, and it is that statute that may be challenged.

* * *

"[I]t is no longer possible, if it ever was, to believe that a sharp line can be drawn between private and public actions. * * *

"In the broadest sense, we expect government 'to provide a reasonable and fair framework of rules which facilitate commercial transactions' [citation omitted]. This 'framework of rules' is premised on the assumption that the State will control nonconsensual deprivations of property and that the State's control will, in turn, be subject to the restrictions of the Due Process Clause. The power to order legally binding surrenders of property and the constitutional restrictions on that power are necessary correlatives in our system. In effect, today's decision allows the State to divorce these two elements by the simple expedient of transferring the implementation of its policy to private parties. * * * [T]he Fourteenth Amendment does not countenance such a division of power and responsibility". *Flagg Bros, supra,* pp 176-179.

instead choosing to institute a lawsuit, the state requires that numerous statutes and court rules be followed by the parties to resolve the dispute. However, no one could disagree that those procedures cannot abridge one's constitutional rights.

Similarly, in these cases, medical malpractice claimants have elected to execute an arbitration agreement. Pursuant to that election, the state requires that "[t]he provisions of this chapter *shall* be applicable to the arbitration of a dispute" involving a medical malpractice claim. MCL 600.5040(1); MSA 27A.5040(1) (emphasis added). Indeed, none of the parties even has control over the terms of the arbitration agreement. MCL 600.5041(2), (3), (5), (7); MSA 27A.5041(2), (3), (5), (7); MCL 600.5042(2)-(4), (8); MSA 27A.5042(2)-(4), (8).[13] Accordingly, it should be concluded that the procedures employed in the latter situation cannot abridge one's constitutional rights and no convincing reasons have been advanced to the contrary. Moreover, under my brother RYAN's analysis, it would follow that the statutes and court rules employed to resolve lawsuits *could* abridge litigants' constitutional rights.

The final distinguishing feature from *Flagg Bros* is the arguments advanced by the parties. In *Flagg Bros,* the plaintiffs did not directly challenge the state-mandated procedures to enforce a warehouseman's lien. Rather, the plaintiffs claimed that their right to procedural due process would be violated if a hearing did not precede the sale undertaken to satisfy the lien; the suit was in essence one for a declaratory judgment. Accordingly, the Supreme Court found that the state's failure to prevent the sale prior to a hearing did

---

[13] See fns 11 and 12. Also, as is obvious from the accompanying text and fn 14, my brother RYAN and I differ regarding interpretation of the MMAA. See *ante,* pp 447-450, 467, 473.

not involve state action; there was no violation of the plaintiffs' constitutional right to due process. Conversely, in these cases, plaintiffs *are* challenging the state-mandated procedures imposed to arbitrate a medical malpractice claim, specifically, that the composition of the arbitration panel deprives them of the constitutionally cognizable right to a fair hearing before an impartial decisionmaker. MCL 600.5044(2); MSA 27A.5044(2). Unlike the plaintiffs in *Flagg Bros,* they are not claiming, and it could not be persuasively argued, that the state's failure to prevent arbitration amounts to a deprivation of procedural due process. State action did not compel or encourage the sale of the goods in *Flagg Bros,* nor does it require arbitration in these cases. Although the state can acquiesce in one's choice of a dispute-resolution mechanism, it cannot statutorily mandate procedures pursuant to the mechanism selected which abridge constitutional rights. Consequently, it should be concluded that, under federal constitutional law, these cases involve state action.

## III

Finally, it should also be concluded that the deprivation of plaintiffs' right to a fair hearing before an impartial decisionmaker, pursuant to state action, is done without due process of law; a due process violation exists. Indeed, in these cases, answering the first two relevant inquiries in the affirmative necessarily leads to the conclusion that due process of law is absent. As explained in § I, the right to a fair hearing before an impartial decisionmaker "is a basic requirement of due process". *In re Murchison, supra.* Thus, finding a

deprivation of that right satisfies both the first and third inquiries under my tripartite analysis.[14]

## IV

In conclusion, I would hold that plaintiffs have been deprived of the constitutionally cognizable right to a fair hearing before an impartial decisionmaker, because of state action, without due process of law. Accordingly, I would affirm the judgment of the Court of Appeals in *Jackson* but reverse its judgment in *Morris* and remand that case to the trial court.

BOYLE, J., did not participate in the decision of this case.

---

[14] In the absence of the present statutory scheme, although the parties could have independently contracted to abide by arbitration which did not afford procedural due process, the state would not be *authorizing and controlling* that arbitration, but might or might not *merely enforce* it.

Also note that in these cases the terms of the statutorily mandated arbitration agreement do not, and perhaps cannot, contain the procedures imposed pursuant to the agreement. Further, there is no indication that the "information brochure" which must accompany the agreement given to the patient explains those procedures. MCL 600.5041(6); MSA 27A.5041(6); MCL 600.5042(7); MSA 27A.5042(7). Even if the brochure did contain such information, the act does not make it part of the agreement nor require or permit that it be read prior to execution of the agreement, *i.e.,* "[t]he brochure shall be furnished the person receiving health care at the time of execution". Thus, even if the state could authorize and control a dispute-resolution mechanism which does not afford procedural due process, it cannot be concluded on this record that patients in cases governed by the medical malpractice arbitration act of 1975 agree to a biased decisionmaker. Further, query whether, even if the agreement contained a term referring to the biased decisionmaker, the inability of the patient to alter that term would nonetheless result in a violation of due process? See, generally, *Cramer v Metropolitan Savings & Loan Ass'n,* 401 Mich 252, 257-260; 258 NW2d 20 (1977), *reh den* 402 Mich 954 (1977), 402 Mich 959 (1978), 405 Mich 830 (1979), *cert den* 436 US 958; 98 S Ct 3072; 57 L Ed 2d 1123 (1978), *reconsideration den* 417 Mich 1114 (1983); *Williams & Works, Inc v Springfield Corp,* 81 Mich App 355, 363-367; 265 NW2d 328 (1978), *rev'd on other grounds* 408 Mich 732; 293 NW2d 304 (1980); *National Airport Corp v Wayne Bank,* 73 Mich App 572; 252 NW2d 519 (1977).